**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| THEODORE HELGESEN, <br><br> Plaintiff, <br><br> v. <br><br> CCF HOLDINGS, LLC d/b/a COMMUNITY CHOICE FINANCIAL, <br> CCF MIP HOLDINGS, LLC, and CCFI COMPANIES, LLC. <br><br> Defendants. | Civil Action File <br> No:_____  4:25-cv-043 <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

COME NOW Theodore Helgesen, ("Plaintiff or Helgesen"), and files this his

Complaint showing the Court as follows:

## PARTIES, JURISDICTION AND VENUE

### 1.

Plaintiff Helgesen is an individual resident of the State of Georgia, who

resides in Chatham County.

2.

Defendant CCF Holdings, LLC d/b/a Community Choice Financial ("Community Choice") is a limited liability company registered to transact business in Delaware. Its principal place of business is 2312 E Trinity Mills Road, Ste 100, Carrollton, Texas 75006 and maintains an office and conducts business in the State of Georgia.  Community Choice may be served through its Registered Agent, Corporation Service Company, 251 Little Falls Drive Wilmington, Delaware 19808.

3.

Defendant CCF MIP Holdings, LLC (hereinafter "CCF MIP"), is a limited liability company registered to transact business in Delaware. CCF MIP Holdings, LLC may be served through its Registered Agent, Corporation Service Company, 251 Little Falls Drive Wilmington, Delaware 19808.

4.

Defendant CCFI Companies, LLC (hereinafter "CCFI"), is a limited liability company registered to transact business in Delaware. CCF MIP Holdings, LLC may be served through its Registered Agent, Corporation Service Company, 251 Little Falls Drive Wilmington, Delaware 19808.

5.

There exists complete diversity of citizenship between Plaintiff on the one hand and Defendants on the other hand.

6.

The amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

7.

Therefore, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

8.

Venue is proper in the United States District Court for the Southern District of Georgia, Savannah Division, pursuant to 28 U.S.C. §§ 1391(b)-(c) because Plaintiff resides in this judicial district.

9.

This Court has personal jurisdiction over Defendant Community Choice pursuant to O.C.G.A. § 9-10-91(a) because it maintains an office and transacts business within the State of Georgia sufficient to anticipate being haled into court in the State of Georgia.

10.

This Court has personal jurisdiction over Defendants CCF MIP and CCFI pursuant to O.C.G.A. § 9-10-91(a) because it transacts business within the State of Georgia through its affiliation and joint ownership with Defendant Community Choice, and by virtue of the fact that it entered into the contract at issue herein within the State of Georgia with a Georgia resident regarding the Georgia operations of Defendant Community Choice.  These contacts with the State of Georgia are sufficient to show that CCF MIP and CCFI should have anticipated being haled into court in the State of Georgia.

## FACTUAL BACKGROUND

### Plaintiff's Prior Employment with the TMX Finance Corporate Services, Inc. Before Community Choice's Acquisition.

11.

Prior to working for Community Choice, Plaintiff Theodore Helgesen was the President and Chief Operating Officer for TMX Finance Corporate Services, Inc. TMX Finance Corporate Services, Inc. was a subsidiary of its parent, TMX Finance LLC (collectively, "TMX").

12.

Over 13 years, Plaintiff earned eight promotions within 11 years at TMX ultimately rising from Director of Operations to President and Chief Operating Officer.

13.

Plaintiff was a Manager of TMX and was one of three Board Members. Plaintiff was also an Officer of TMX. After the Acquisition (defined below), Plaintiff remained a Manager and Officer of TMX.

**The Acquisition of TMX by Defendant Community Choice**

14.

TMX was acquired by Community Choice through a series of corporate transactions, two of which were a Master Loan and Security Agreement dated February 10, 2023 ("ABL Agreement") and a Credit Agreement dated February 17, 2023 (the "Credit Agreement"), on or about February 17, 2023 (the "Acquisition"). The ABL Agreement and Credit Agreement were between an affiliate of TMX and BP Commercial Funding Trust, II, Series SPL-XVI, a statutory series of BP Commercial Funding Trust II, a Delaware statutory trust, for itself and for no other series of BP Commercial Funding Trust, as administrative agent (collectively "BasePoint Capital").

15.

In essence, BasePoint Capital provided the capital for Defendant Community Choice to buy out TMX's owner, and Defendant Community Choice absorbed TMX's operations, infrastructure, and talent into the CCF umbrella. Defendant Community Choice acquiring TMX was the equivalent of the minnow swallowing a whale.

16.

TMX's strong performance under the guidance and strategy of Plaintiff was one of the main reasons TMX was so attractive to BasePoint Capital and Community Choice.

17.

The Credit Agreement and ABL Agreement provided that Plaintiff was a "key employee," and should a key employee for any reason cease to be (1) an employee of Borrower (TMX) or any subsidiary of Borrower or (2) actively involved in the day-to-day management of the Borrower unless certain conditions were met, a Cease-Funding Event would occur.

18.

Through the course of the Acquisition, Plaintiff became very familiar with BasePoint Capital's C.E.O. Eric Schneider.  Mr. Schneider encouraged Plaintiff to reach out to him at any time about anything.

**Plaintiff's Employment Agreement with Defendant Community Choice**

19.

Community Choice, recognizing Plaintiff's unparalleled talent and the indispensable role he played in ensuring the sustained success of TMX's business and operations, retained him as President. Defendant Community Choice also made Plaintiff an Officer of the existing CCF entities.

20.

Defendant Community Choice memorialized its retention of Plaintiff in the capacity of President in an employment agreement dated July 26, 2023.

21.

The employment agreement provided, inter alia, that if Defendant Community Choice terminated Plaintiff's employment without cause after one year of employment, Defendant Community Choice would pay Plaintiff: (a) Twelve months of salary; (b) An amount equal to his 2023 retention bonus in the amount of

$300,000.00; and (c) An amount equal to his 2023 EBITDA bonus in the amount of $694,452.37.

22.

A substantial portion of Plaintiff's compensation was to come from his participation in and eligibility for various bonus compensation plans for certain executives, including a corporate bonus opportunity that was payable quarterly, an EBITDA bonus, and a 2023 retention bonus. Plaintiff received his compensation from Defendant CCFI.

23.

Additionally, on January 1, 2024, Plaintiff was granted 9.002 Class B Units representing a 2.369% profits interest in Defendant CCF MIP pursuant to a Profits Interest Award Agreement (hereinafter referred to as the "Award Agreement").

24.

Pursuant to the Award Agreement, all of the Units, inter alia, immediately vest in the event that Plaintiff's employment is terminated without cause.

25.

Plaintiff's 2024 Quarter 4 corporate bonus, as set forth in his employment agreement, was earned and approved by Defendant Community Choice's

Compensation Committee on or around February 4, 2025, and was scheduled to be paid on February 26, 2025.

**Performance of Defendant Community Choice with Plaintiff at the Helm**

26.

Under Plaintiff's leadership, Community Choice consolidated all retail stores and products under his direct authority, where he spearheaded transformative improvements and executed a sweeping hierarchy reorganization throughout 2024. His decisive leadership unified Community Choice under a single, cohesive leadership structure and strategic vision, driving unmatched operational efficiency and performance.

27.

Plaintiff had nine direct reports and was directly responsible for all retail operations, secured credit risk strategy, secured lending strategy, product, asset collection, recovery and remarketing strategy, training, learning and development, bankruptcy, talent acquisition, business operations, and customer preservation. In total, Plaintiff was responsible for 5,980 – 5,800 employees in store operations and 180 corporate employees.

28.

Community Choice experienced an exceptional year of performance and results in 2024, driven by the retail channel despite significant total account loss in the online channel.

29.

Community Choice's growth in retail was propelled by the secured book of business (mostly the old TMX retail locations), where Plaintiff managed and directed all operations and served as the primary subject matter expert.

30.

Plaintiff's leadership in credit strategy, underwriting, risk management, and collections was instrumental in driving Community Choice's growth.

**Defendant Community Choice Begins its Campaign to Limit Plaintiff's Visibility to Critical Financials Discussions, Shareholders and Investors, and Information**.

31.

Plaintiff's primary duties included designing and executing the company's strategy, managing performance, implementing process improvements, enhancing credit risk and collateral valuation models, and closely monitoring and analyzing financial trends. Despite Plaintiff's efforts and the company's unprecedented performance, prior to and throughout January 2025, Plaintiff was increasingly

excluded from critical financial discussions regarding the company. This exclusion extended to meetings with various shareholders and lenders where the company's financial performance was reviewed and discussed.

32.

Although Plaintiff is the President and Officer of Community Choice (and Manager, Board Member, and Officer of the TMX subsidiaries), responsible for all retail locations' strategy and financial performance, Community Choice has recently employed a strategy of gradually removing his visibility and access to critical financial data.

33.

On or about the last week of December, the company's largest shareholder, Allen Jones, visited the Carrollton, Texas corporate office to get a business update. While in Dallas, Mr. Jones was introduced and toured departments directly managed by Plaintiff, but Plaintiff was not invited to attend. Rather, Kyle Hanson, Defendant Community Choice's Chief Executive Officer ("CEO" or "Hanson") and President Baker (defined below) attended the meeting with Mr. Jones.

34.

Starting in January 2025, discussions began between BasePoint Capital and Defendant Community Choice about amendments to the ABL Agreement and the

Credit Agreement. The Closing Date for the amendments were scheduled for February 10, 2025. In connection with the renewal, updated due diligence efforts began. At the time, Plaintiff was unaware of why amendments were necessary to the credit documents and was not included in discussions around the necessity of the amendments.

35.

Throughout January 2025, Defendant Community Choice began directing employees who reported to Plaintiff to provide materials necessary to refresh due diligence items related to the ABL Amendment and Credit Amendment. Plaintiff was unaware that his direct reports or others in his chain of command were being asked to provide this information until one of his direct reports copied him on an email, expressing her discomfort that he had been excluded from the process.

36.

Upon learning of this, Plaintiff advised Chief Financial Officer, Julie Torkelson ("CFO" or "Torkelson"), that he personally would review the refreshed data provided by his employees. However, when he requested access from Torkelson to the Due Diligence folder (wherein information was consolidated and stored for use in the due diligence efforts), access was never provided. Instead, a member of

12

the Accounting and Finance team, Dustin Thornton, had to retrieve the documents and display them on Mr. Thornton's own screen for Plaintiff to conduct his review.

37.

Plaintiff was never provided access to the due diligence folder despite his role in the organization and his extensive efforts in providing due diligence when TMX was sold. Plaintiff found this highly irregular and concerning.

38.

Plaintiff was never told that he personally would be required to sign the ABL Amendment and Credit Amendment.

39.

On February 5, 2025, after learning from a third party that one of his direct reports had been pressured to alter numbers for an investor presentation, Plaintiff confronted the employee who admitted both to making the alteration and to the pressure exerted by the CEO. Expressing clear disappointment, Plaintiff reminded this employee of his duty to the company and the serious consequences of compromising his integrity. Plaintiff made it unequivocally clear that altering findings under executive pressure was unacceptable and would not be tolerated under any circumstances.

40.

The next day, February 6, 2025, Hanson called Plaintiff and asserted that revenue had declined substantially year-over-year in 2024. This statement contradicted all available data, reporting, and previously provided financials to the executive team and, possibly, but unknown to the Plaintiff, to investors and lenders. When Plaintiff questioned Hanson's underlying data and methodology for this sudden alleged reversal in performance, Hanson was adamant that the "Plaintiff's reporting" was incorrect (reporting provided by the Company to the President of which he had used to make all previous business decisions), and Hanson cited a report called the This Year Last Year Report as the proper source of the company's economic condition.

41.

In a meeting with Community Choice's leadership to discuss Hanson's financial information, Plaintiff immediately raised concerns about this material discrepancy between Hanson's reports and the financial data consistently used by Community Choice throughout 2024. Attendees included Hanson, Torkelson, Chief Administrative Officer Lisa Vittorini ("Vittorini"), President of Online Operations Bill Baker ("Baker"), and Plaintiff. Michael Durbin ("Durbin"), the *former* Chief

Financial Officer, a Community Choice *contractor*, led the meeting[1]. Durbin presented a downward variance of over $50 million in year-over-year revenue in a one-page PDF, which was neither distributed during the meeting nor provided to the Plaintiff afterward. Plaintiff immediately worked to reconcile the reported downturn by aligning standardized daily reporting—used across all stores and leadership levels—with the This Year Last Year Report, which had been cited by Hanson as the definitive source of the company's finances.

42.

That evening, in discussions with Baker, both Baker and Plaintiff agreed that the numbers presented by Durbin were incorrect.

43.

The following morning, Plaintiff obtained the most accurate and up-to-date This Year Last Year reports for the trailing twelve months. He then conducted a painstakingly thorough review, comparison, and validation, confirming that the This Year Last Year report closely aligned with standard financial reporting Plaintiff, and the company, had used for 2024. Plaintiff found no support for the reported negative variance. In fact, rather than a $50 million downturn, he reaffirmed a year-over-year

---

[1] Plaintiff had little prior interaction and next to no discussions regarding company performance for 2024 with Contractor Durbin.

increase of $72.93 million in retail revenue and a $51.3 million increase in total Community Choice revenue—completely contradicting the reported shortfall.

44.

Plaintiff presented his findings to Hanson, Baker, and Torkelson. Instead of praising Plaintiff's efforts with relief, Plaintiff was instructed to cease further analysis to validate the information by Hanson. Hanson cited "versioning" issues in the reporting, stated that he would "work on it personally over the weekend," and directed Plaintiff to "stand down." Subsequently, Baker informed Plaintiff that Hanson had said he would personally handle the discrepancies and that both Baker and Plaintiff were to shift their focus to 2025 goals.

## Community Choice Asks Plaintiff to Sign ABL Amendment and Credit Amendment

45.

The next day, on February 7, 2025, Defendant Community Choice instructed Plaintiff that he needed to immediately sign the ABL Amendment and Credit Amendment. The Credit Amendment and ABL Amendment both included extensive representations and warranties concerning the company's obligations and/or financial positions and other matters under the credit documents[2]. Not only

---

[2] For example, Section 5.1 of the ABL Amendment stated: "Immediately after giving

16

had Plaintiff recently raised concerns about the data behind and financials presented in the February 6 meeting, but also Plaintiff had been excluded from all meetings with lenders or shareholders where financial matters were discussed, and had not been provided access to the due diligence folder containing refreshed materials around the ABL Amendment and Credit Amendment, and was told by his direct report that Hanson asked for information in an investor document to be changed.

---

effect to this Amendment (a) the representations and warranties contained in the Loan Agreement, as amended by this Amendment, are true, accurate and complete in all material respects (without duplication of any materiality qualifier therein) as of the date hereof (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such date), (b) no Default, Event of Default or Cease Funding Event has occurred and is continuing, (c) each Loan Party is in good standing under the laws of the jurisdiction of its incorporation, organization or formation, (d) no amendment, modification or other change has been made to (i) the articles of organization (or other applicable charter document), or (ii) the operating agreement (or other applicable document) of each Loan Party, and (e) the execution, delivery and performance of this Amendment by each Loan Party has been duly authorized by all necessary corporate or other organizational action;" Also, Section 5.1 of the Credit Amendment contains an almost identical provision with respect to the Credit Agreement compared to the Loan Agreement. Also, Section 1(c) of a Reaffirmation of Limited Payment Guaranty and Loan Documents which Plaintiff was asked to sign in connection with the ABL Amendment likewise stated "represents and warrants that on the date hereof, immediately after giving effect to the Amendment, no Default, Event of Default or Cease Funding Event has occurred or is continuing."

46.

Plaintiff was informed by the Chief Legal Officer, Ghazi Dakik ("CLO" or "Dakik"), that it was necessary for him to be the signer of the document because he was the only remaining Officer of TMX.  Based on information and belief, this was an inaccurate statement.

47.

Upon demanding his signature, Dakik only sent Plaintiff the Credit Amendment and ABL Amendment signature pages without the amendments themselves or any context regarding why changes were needed.  Plaintiff had to text Dakik to request the actual ABL Amendment and Credit Amendment.  Plaintiff also inquired as to who had previously signed the ABL Agreement and Credit Agreement.  Dakik explained it was previously signed by TMX's owner and CEO.

48.

Plaintiff received the emails and the proposed changes to the ABL Agreement and Credit Agreement on Friday, February 7, 2025, at 7:23 p.m. Eastern time. Closing was set to occur on Monday, February 10, 2025. Plaintiff spent most of Saturday, February 8, 2025, reviewing the ABL Amendment and Credit Amendment's language and the proposed changes.  During this review, Plaintiff

learned that the ABL Amendment and Credit Amendment were to remove Plaintiff and Torkelson as "key employees" and replacing them with Hanson.

49.

Plaintiff was concerned that he was not included in any recent financial meetings and even more concerned that he was being asked to sign something certifying financials, knowing he had just spent the previous two days trying to track down an unexplained $100M variance Hanson had told him to "stand down" on his efforts to resolve the alleged financial disparities. Further, Plaintiff was aware that this document attempted to remove Plaintiff and Torkelson as key employees – arguably the two who had the most access to the financials and who were the most knowledgeable on TMX's secured lending portfolio.

50.

Dakik never explained why Hanson was not signing the ABL Amendment or Credit Amendment, especially when the ABL Agreement and Credit Agreement were last signed by the TMX CEO.

51.

Plaintiff was struck by the breadth of information he was expected to certify by signing the ABL Amendment and Credit Amendment and expressed his grave concerns to the Dakik.

52.

Dakik was fully aware that Plaintiff had never seen or signed any prior credit document before and that he lacked the necessary financial verification and access to or sufficient time to review due diligence. Despite this, no effort was made to provide the required information before sending the signature pages for Plaintiff's signature.

53.

Defendant Community Choice continued to pressure Plaintiff to sign the ABL Amendment and Credit Agreement over the weekend, despite Plaintiff's legitimate concerns about blindly signing documents in which he was affirming the accuracy of financials numbers and company obligations and due diligence efforts that he had been purposefully excluded from. Plaintiff could neither admit nor deny the financial information contained in these agreements.

54.

Plaintiff continued to text questions about the documents throughout the day Saturday to Dakik.  Plaintiff asked, "is this the agreement that came as a result of the BasePoint meetings last week?"  Dakik admitted that some of the information came from the meeting Plaintiff had been excluded from, and in response, Plaintiff

responded: "up until our phone conversation yesterday, I was completely unaware that I would be the one asked to sign this document."

55.

In response, Dakik offered to remove Plaintiff from his position as an Officer of the TMX subsidiaries to prevent him from having to sign future documents. However, Defendant insisted that Plaintiff was the only one who could sign the documents under the current organizational structure. Upon information and belief, CLO Dakik's statement was untrue.

56.

Finally, at 5:15 p.m. Eastern on Saturday, after Dakik had once again asked if he would sign, Plaintiff informed Dakik:

> I appreciate the opportunity to review the Agreement. However, I must respectfully decline to sign the document. My duties as President and board member have been so extensively diminished that I no longer have the necessary access to, visibility, or inclusion into the company's financial conditions or any other material facts referenced in this agreement. I have not been provided with, nor do I have any knowledge of, the financial statements or disclosures reported in connection with this agreement. Due to this lack of insight, I am unable to verify the accuracy of any financial representations contained in the agreement, including whether financials have been misstated or if material facts have been withheld. Without proper visibility into these matters, I cannot, in good faith, sign a document that may require me to represent, warrant, or provide assurances regarding

financial information I cannot verify. I was not seeking or requesting a reduction in my responsibilities or any further limitation on my role or access. You don't need to streamline the corporate entity structure. Rather, I believe it is in everyone's best interest to work *towards a mutually beneficial separation* (emphasis added).. If we approach this reasonably, this should be a straightforward process requiring only limited attorney involvements [sic] needed. I'd like to handle this in a way that works for everyone involved . . . I want to make this process as smooth as possible and avoid unnecessary complications.

57.

At no time did the Plaintiff resign, submit a resignation, or express any intent or desire to resign.

**Community Choice Terminates Plaintiff's Employment Without Cause**

58.

In response, Defendant Community Choice, through Hanson, emailed Plaintiff Sunday evening February 9, 2025, stating, "Sorry to hear you have decided to leave the company. In light of your resignation, we will immediately start our work to ensure a smooth transition of your responsibilities."

59.

Plaintiff reiterated this position in an email, Monday, February 10, 2025, to Hanson:

> To be clear, I have recommended *a mutually beneficial separation agreement* (emphasis added) to address the misalignment between the requirements of my role as a board member and president and the significant diminishment in my access to and involvement in executive leadership meetings and reporting. To avoid further miscommunication, I will retain legal counsel and will provide you with my attorney's contact information. In the meantime, I will complete this morning's strategy calls, address any outstanding requests, and take the afternoon as a half day of PTO.

This communication reinforced Plaintiff's intent to continue performing his responsibilities while securing legal representation to facilitate discussions regarding the separation agreement.

60.

Plaintiff worked that morning, as promised, in good faith, fully engaged in his duties, unaware that Defendant had already begun spreading falsehoods. As he carried out his responsibilities, trusting that Community Choice personnel would be professional, Hanson was actively undermining him. Defendant Community Choice knowingly and falsely informed its employees that Plaintiff had voluntarily resigned in a calculated effort to distort the circumstances of his departure. Defendant deliberately misrepresented the truth, severely damaging Plaintiff's reputation and credibility.

61.

Later that evening, Plaintiff attempted to access his work email—only to discover that, without notice, Defendant had revoked his access to email, financial reporting systems, and all company information. This abrupt and unilateral action effectively erased his presence within the organization, creating the false impression of instability or misconduct.

62.

Over the next several days, Plaintiff received numerous calls and text messages from employees expressing their devastation and confusion as to why they were told he was "no longer with the organization" or that he had resigned.

63.

On Wednesday, February 12, 2025, Plaintiff received an email to his personal account from CPO Desilets which falsely stated, "Due to your notice of resignation, you have been placed on paid administrative leave, and your network access rights have been suspended. Please contact Ghazi Dakik, Chief Legal Officer, with any questions you may have."

64.

Plaintiff never submitted a notice of resignation, nor had he stated any intention to resign.  This email was yet another deliberate attempt by Defendant to

fabricate a false narrative, mischaracterize the circumstances of Plaintiff's employment, evade its severance obligations, and justify Plaintiff's termination without cause.

65.

That same evening, Plaintiff received a letter from Dakik, containing factually inaccurate statements that contradicted prior written communications. In addition to these misrepresentations, the letter escalated Community Choice's efforts to evade its severance obligations to Plaintiff by recharacterizing his communications— previously publicly labeled by Community Choice as a "resignation"—as a "for cause termination." For the first time, the letter also alleged "insubordinate" actions by Plaintiff in a further attempt to justify this wrongful termination.

66.

Plaintiff's 2024 Quarter 4 corporate bonus, as set forth in his employment agreement, was earned and approved by Defendant Community Choice's Compensation Committee on or around February 4, 2025, and was scheduled to be paid on February 26, 2025.

67.

To date, Defendants Community Choice and CCFI have failed to pay Plaintiff his 2024 Quarter 4 corporate bonus.

68.

To date, Defendant CCF MIP has failed to recognize the vesting of Plaintiff's Class B Units and failed to tender such Units to Plaintiff upon his termination without cause.

## COUNT I:
## BREACH OF CONTRACT

69.

Plaintiff hereby incorporates by reference paragraphs 1 through 68 of his Complaint, as if specifically set forth herein.

70.

Plaintiff's employment agreement provided that if Defendant Community Choice terminated Plaintiff's employment without cause, Defendant Community Choice would pay:

- Twelve months of severance.

- 2023 retention bonus of $300,000; and

- 2023 EBITDA bonus of $694,452.37

71.

Defendants Community Choice and/or CCFI breached the employment agreement by failing to pay Plaintiff the aforementioned severance items by falsely

claiming that Plaintiff had resigned from employment or had been terminated for cause, when no such justification existed.

72.

Plaintiff's employment agreement also provided for his quarterly bonus payments, and Plaintiff's 2024 Quarter 4 bonus was earned and approved by Defendant Community Choice and was promised to be paid to Plaintiff on February 26, 2025.

73.

Defendants Community Choice and/or CCFI breached the employment agreement by failing to pay Plaintiff his earned and approved 2024 Quarter 4 bonus.

74.

As a direct result, Plaintiff has been damaged in the amount of his 2024 Quarter 4 bonus.

75.

Under the Profits Interest Award Agreement, Plaintiff's Class B Units in Defendant CCF MIP would become 100% vested upon termination without cause.

Case 4:25-cv-00043-LGW-BWC    Document 1    Filed 03/04/25    Page 28 of 34

76.

Defendant CCF MIP breached the Profits Interest Award Agreement by failing to recognize the vesting of Plaintiff's Class B Units and for failing to tender such Units to Plaintiff upon his termination without cause.

77.

Defendant CCF MIP's breach of contract proximately damaged Plaintiff in an amount to be proven at trial.

78.

Defendants' breach of contract proximately damaged Plaintiff in an amount to be proven at trial but in an amount in excess of $1,744,452.37.

**COUNT II:**
**BAD FAITH AND BREACH OF DUTY OF GOOD FAITH**
**AND FAIR DEALING**

79.

Plaintiff hereby incorporates by reference paragraphs 1 through 68 of his Complaint, as if specifically set forth herein.

80.

Defendant Community Choice breached its duty of good faith and fair dealing through a pattern of conduct designed to create pretextual grounds for termination, including: (a) demanding that Plaintiff certify the ABL Amendment and Credit

28

Amendment without providing him access to the necessary information; (b) claiming that Plaintiff resigned his employment when he refused to blindly certify the ABL Amendment and Credit Amendment; (c) then claiming Plaintiff was "insubordinate" and terminated for cause when no such cause existed. Defendant CCFI adopted and ratified this bad faith when it failed to pay the aforementioned amounts to Plaintiff. Defendant CCF MIP adopted and ratified this bad faith when it failed to recognize the vesting of Plaintiff's shares and failed to tender such shares to Plaintiff upon his termination without cause.

81.

Defendants' attempt to avoid paying Plaintiff the agreed upon amounts and tendering the shares of stock as required under their respective contracts is a direct breach the employment agreement and the Award Agreement and evidences bad faith and Defendants' malicious intent not to pay Plaintiff as promised or provide the shares as promised.

82.

Defendants' lack of defense to payment and tender of shares in direct breach of the employment agreement and Award Agreement evidences that degree of bad faith which constitutes a violation of the duty of good faith and fair dealing inherent

in every contract under Georgia law, entitling Plaintiff to attorney's fees and damages in the full amount owed under the employment agreement.

83.

Additionally, at least one senior leader within Defendant's organization has explicitly stated that they would retaliate against any vendor that employed Plaintiff, effectively discouraging business relationships and further isolating him from career opportunities. Vendors who depend on business from CCF now fear that associating with Plaintiff would lead to financial consequences and loss of contracts, effectively blacklisting him from critical professional networks and evidencing Defendants' bad faith.

84.

Plaintiff is entitled to the full value of the amounts owed under the employment agreement and Award Agreement and all damages proximately resulting from Defendants' bad faith and breach of their duty of good faith and fair dealing, including but not limited to attorneys' fees in an amount to be proven at trial.

85.

As a direct result of Defendant's deliberate and bad-faith actions, Plaintiff has suffered severe, lasting, and quantifiable harm, including but not limited to:

30

Loss of Job Opportunities: Defendant's false and defamatory statements have created significant industry hesitation in hiring Plaintiff, as prospective employers now view the inaccurately reported resignation as a red flag, unjustly questioning his reliability and professional integrity.

Substantial Reduction in Earning Capacity: Defendant's misrepresentation of Plaintiff's departure has made securing comparable executive employment extremely difficult, leading to significant and ongoing financial losses.

Severe and Lasting Reputational Damage: Plaintiff—who built a respected career through over a decade of leadership and high performance—now faces an uphill battle to restore his professional reputation. The false narrative perpetuated by Defendant has deeply damaged his credibility, making the reputational harm even more severe due to his previously high-profile success.

Diminished Leadership Credibility: Defendant's actions have undermined Plaintiff's ability to secure board positions, C-suite roles, and other executive opportunities that require a strong professional reputation and industry trust.

Loss of Business Relationships and Industry Trust: Vendors and industry partners, lacking full context, have been misled into assuming Plaintiff engaged in misconduct or professional instability. Additionally, vendors fear retaliation from

Defendant if they associate with Plaintiff, leading to a loss of critical business relationships and professional opportunities.

86.

These injuries—resulting directly from Defendant's intentional and bad-faith actions—have caused permanent and measurable financial, reputational, and emotional harm to Plaintiff proximately caused by Defendants' bad faith.

**COUNT IV:**
**ATTORNEY'S FEES**

87.

Plaintiff hereby incorporates by reference paragraphs 1 through 68 of his Complaint, as if specifically set forth herein.

88.

Plaintiff is entitled to the recovery of the costs of litigation and its attorney's fees under O.C.G.A. § 13-6-11 as Defendants have been unreasonably litigious and caused Plaintiff unnecessary trouble and expense by not following their own agreements with Plaintiff and wrongfully claiming that Plaintiff resigned. Accordingly, Plaintiff is entitled to expenses of litigation, including attorney's fees, under O.C.G.A. § 13-6-11.

89.

Further, Defendants' deliberate attempt to rewrite the terms of two distinct contracts evidences that species of bad faith sufficient to justify an award of attorney's fees.

**WHEREFORE**, Plaintiff respectfully prays of this Court as follows:

A.    Enter judgment in favor of Plaintiff against Defendants as set forth in each count of this Complaint.

B.    Award Plaintiff actual and compensatory damages as set forth above in an amount to be determined at trial, plus interest pursuant to O.C.G.A. § 7-4-12;

C.    Award Plaintiff his reasonable attorneys' fees and expenses of litigation pursuant to O.C.G.A. §13-6-11 and.

D.    For an award of Plaintiff's costs of this action against Defendants; and

E.    For such other and further relief as this Court deems just, proper and equitable under the circumstances.

Respectfully submitted this 4th day of March, 2025.

/s/Milinda Brown
Andrew M. Beal
drew@beal.law
Georgia Bar No. 043842
Milinda Brown

milinda@beal.law
Georgia Bar No. 363307

BEAL SUTHERLAND BERLIN & BROWN, LLC
2200 Century Parkway, NE, Suite 100
Atlanta, Georgia 30345
T: (404) 781-1100
F: (404) 688-2988
*Counsel for Plaintiff*